IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2025

**STATE OF TENNESSEE v. ARTHUR DAVIS HICKS, JR.**

**Appeal from the Circuit Court for Lincoln County**
**No. 21-CR-93      Forest A. Durard, Jr., Judge**

_____

**No. M2024-00505-CCA-R3-CD**

_____

Arthur Davis Hicks, Jr., ("Defendant") appeals his convictions for reckless aggravated assault resulting in death and felon in possession of a weapon, for which he received a total effective sentence of twenty-eight years' incarceration. Defendant contends that: (1) the evidence is insufficient to support his convictions; (2) the trial court abused its discretion by admitting testimony from the State's expert forensic scientist regarding gunshot residue analysis performed by her co-worker; (3) the trial court erred in excluding testimony regarding the victim's prior history of carrying a weapon and his "violent tendencies"; and (4) the trial court imposed an excessive sentence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and KYLE A. HIXSON, J., joined.

Jonathan C. Brown, Fayetteville, Tennessee, for the appellant, Arthur Davis Hicks, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Robert J. Carter, District Attorney General; and Amber Sandoval and Michael Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

This appeal arises from the shooting death of Victor Teran Ford ("the victim") on August 2, 2020, in Fayetteville. The incident occurred at a community cookout where the

victim and Defendant engaged in a heated argument, after which Defendant retrieved an AR-15 out of the trunk of his car and shot the victim once in the chest, resulting in the victim's death. The Lincoln County Grand Jury subsequently indicted Defendant, charging him with first degree premeditated murder and felon in possession of a weapon.

*Trial*

At trial, Keidrick Williams testified that, on August 2, 2020, he was working as an officer with the Fayetteville Police Department (FPD), when he was dispatched to a residential area on Bellview Avenue South around 7:15 p.m. in reference to a "shots fired call with injuries." When he arrived at the intersection of Bellview Avenue South and Robertson Street, Officer Williams saw multiple people out in the roadway. Officer Williams testified that they appeared to be having a block party and that there were cars lining the street and cars parked in a vacant lot nearby. Officer Williams saw the victim lying on his back on the roadway and found that he had a gunshot wound to his chest and no pulse. Officer Williams and FPD Officer Andy Rodriquez began performing CPR on the victim until the fire department and EMS arrived and took over resuscitation efforts. Officer Williams and Officer Rodriquez testified that the victim was not wearing a fanny pack when they began performing CPR, and they did not recall seeing a fanny pack or a weapon near the victim.

FPD Patrol Sergeant Doug Allen testified that he responded to the scene of the shooting, arriving about the same time as Officer Williams. Sergeant Allen saw the victim lying in the middle of the street with three or four people surrounding him and "large crowds on both sides of the street[.]" Sergeant Allen approached the victim and checked for signs of life but found none. Officer Williams began giving the victim chest compressions while Sergeant Allen kept the crowd back. Sergeant Allen testified that he did not observe anyone removing anything from the victim or from the area around the victim and that he did not see a fanny pack or weapon. Once the victim was transported from the scene, Sergeant Allen began taping off the crime scene and spoke to Ericka Belcher, who gave him the victim's ID.

Fayetteville Fire Department Captain Billy Miles testified that the fire department responded to the scene of the shooting along with EMS. When he arrived, he saw the victim lying on the road with police officers "already doing chest compressions on the [victim]." Captain Miles assessed the victim's airway, breathing, and circulation and found "none." He observed that the victim had a gunshot wound to his chest but that there was no exit wound. He secured the victim's airway, loaded the victim into an ambulance, and continued resuscitation efforts en route to the hospital. Captain Miles testified that, while working on the victim, he saw no weapons on or around the victim and did not observe a fanny pack.

- 2 -

Chris Jackson testified that, in August 2020, he was employed as a paramedic with the Lincoln County Medical Ambulance Service. Mr. Jackson also responded to the scene of the shooting on the evening of August 2, 2020, where he began assisting two officers and a firefighter already attending to the victim. After transporting the victim, Mr. Jackson remained at the hospital for approximately an hour assisting with the victim's care; however, the victim never responded to the attempts at resuscitation.

Dr. Erin Carney testified that she was a forensic pathologist who worked as the Deputy Chief Medical Examiner for Davidson County and that she performed the victim's autopsy on August 3, 2020. Dr. Carney stated that she determined the cause of the victim's death was a gunshot wound to his chest and that the manner of death was homicide. She explained that the bullet entered to the right of the victim's sternum and injured the liver, left lung, and the back side of the heart. Dr. Carney stated that the bullet traveled through the victim's aorta, tearing it in half. The bullet also injured the esophagus, went through the lower spine, and broke one of the victim's ribs. She said that there was no exit wound and that she retrieved bullet fragments from the victim's body. Dr. Carney confirmed that testing of the victim's blood sample revealed that it contained alcohol, cocaine, hydrocodone, and marijuana.

FPD Commander Colby Templeton testified that he responded to the scene on Bellview Avenue South while EMS was attending to the victim and that he remained at the scene after the victim was transported to the hospital. Commander Templeton prepared a sketch of the scene, which indicated, among other things, the location of a shell casing discovered on the ground. He testified that a fanny pack was not found at the scene.

FPD Officer J.T. Mastin testified that, three days after the shooting, the police department received a tip that Defendant was at a house on Johnson School Road. When officers went to the house to serve arrest warrants on Defendant, they found that he was not there but that his vehicle, a silver Dodge Charger, was on the premises. Officer Mastin testified that Defendant's vehicle was seized, towed to the FPD, and later transported to the Tennessee Bureau of Investigation (TBI) crime laboratory.

Justin Hayden testified that, on September 20, 2020, he was employed as an officer with the Smyrna Police Department (SPD). Officer Hayden explained that he was contacted by FPD after there was a "hit" on a license plate reader in Smyrna for a white Nissan Rogue belonging to Regina Shelton. Officer Hayden and other SPD officers began looking for Ms. Shelton's vehicle and located it in the parking lot of Uptown Suites, a hotel near Interstate 24. Officer Hayden then observed Ms. Shelton exiting the hotel, getting into her vehicle, and attempting to leave the parking lot. Officer Hayden and other SPD officers stopped Ms. Shelton and took her into custody; they then began looking for Defendant at the hotel. On hotel video, they saw Defendant walking up hallways trying to

get inside different rooms, but after some time, Defendant walked out of a stairwell and surrendered to police. Defendant and Ms. Shelton were then transported to the Rutherford County Jail. Officer Hayden confirmed that Defendant's hotel room had been rented in MaKayla Ragsdale's name.

Deborah Harper testified that on August 2, 2020, she and her child attended the cookout on Bellview Avenue South. Ms. Harper stated that she was related to the victim and Defendant, and she recalled seeing both men at the party. She testified that Defendant drove a silver Dodge Charger and that his car was parked "over to the side" of the road. At one point, Ms. Harper saw the victim standing by Defendant's car "getting ready to get in[.]" She saw the trunk lid of Defendant's car open and then heard someone say that there was "fixing to be problems[.]" As Ms. Harper went to retrieve her child, she heard gunshots. Ms. Harper then saw the victim lying motionless on the roadway, and she ran over to him. She testified that the victim did not have a weapon or a fanny pack and that there was "nothing laying around him." She acknowledged that the victim had routinely worn a fanny pack but said that she had never seen him with a gun.

Nicky Kent testified that she attended the cookout on Bellview Avenue South on August 2, 2020, which was held to celebrate her husband's birthday. Ms. Kent said that she saw the victim and Defendant and noted that Defendant's car and the victim's girlfriend's car looked similar. At one point, Ms. Kent saw the victim looking into Defendant's car "thinking it was [the victim's] car because his car was parked there first[.]" She then heard the victim apologize to the occupants of Defendant's car "multiple times" before the victim walked away.

After the victim walked away from Defendant's car, Defendant got into the car and drove away, but Defendant soon returned. She saw Defendant get out of his car and confront the victim, although she could not hear what Defendant said. During this confrontation, the victim was "calm" and "not doing anything[.]" Ms. Kent testified that the victim had on a fanny pack but that he took it off and put it on the ground. Ms. Kent then heard a gunshot, and she called 9-1-1.

On cross-examination, Ms. Kent said that she had not seen the victim with a gun and that she did not know where the victim's fanny pack went after the shooting.

Brenda Fox testified that on August 2, 2020, she was in a car with her friend when they turned onto Bellview Avenue South where there appeared to be a party. Ms. Fox explained that they had to stop because Defendant's car was directly in front of their car, going in the opposite direction. Ms. Fox saw Defendant sitting in the driver's seat of his car, and the victim walking towards the passenger side of Defendant's car. Defendant's car door opened, and then Ms. Fox heard a loud "boom[.]" She testified that, the moment

- 4 -

the car door opened, the victim got shot; he grabbed his chest and fell backward. Ms. Fox did not see anything in the victim's hands prior to the shooting, and she did not see the victim do anything threatening toward Defendant or passengers in his car. After the shooting, Defendant sped past Ms. Fox "really fast[,]" and she heard the passenger in Defendant's car screaming at Defendant, "You shot him! You just shot him!" Ms. Fox remained at the scene until police arrived and spoke to Sergeant Allen later that night. She testified that she did not see anyone take a fanny pack off the victim.

Ericka Belcher testified that she began dating the victim about a week before the shooting and that the victim stayed at her home in Coffee County. Ms. Belcher explained that, on August 2, 2020, she and the victim drove to Fayetteville in her gray Dodge Charger so that the victim could pick up some studio equipment from his aunt. She continued:

> We came to get the studio equipment from his aunt's house. The aunt was not at home at the time so [the victim] said we will give it a minute and ride around for a second. We rode around and when we got to that Bottoms place, that is where . . . we stopped at because it was a cookout going on.

Ms. Belcher testified that the victim had a fanny pack. She said that, in the week she had known the victim, she had not seen any violent tendencies from him, but she acknowledged that, before they arrived at the cookout, she learned that the victim had a gun with him. She told the victim that she did not want a gun in her car, so the victim "met somebody and gave it to somebody" when they got to Fayetteville.

When they arrived at the cookout, Ms. Belcher parked her car off the side of the road by a fence, but she later moved her car to a nearby empty field. She then saw a car that "looked identical" to her car park where she originally parked. She testified that, at one point, the victim "opened the driver door like he was going to get in the car. And then he said, 'oh, sh**, this ain't the car I'm supposed to be in, this is the wrong car.' And he shut the door." She continued, "It was not an act. He thought he was getting into my car. Once he realized he was getting into the wrong car, he closed the door and backed up from it." Ms. Belcher said that she saw a woman in Defendant's car with a little girl sitting in her lap.

Ms. Belcher eventually saw Defendant get into his car and drive off; he then reversed the vehicle and returned to the scene. Defendant got out of his car and said to the victim, "I don't appreciate nobody in my car saying nothing to my b**ch." The victim explained to Defendant that he thought it was Ms. Belcher's car, and then they began arguing. Ms. Belcher testified that the victim still had on his fanny pack but insisted that she never saw the victim "making a motion like he [was] trying to open the fanny pack or unzip the fanny pack . . . [to] retrieve anything from inside the fanny pack[.]" Ms. Belcher

- 5 -

continued, "After they argue for a minute and size each other up, [Defendant] hits the trunk and the girl that's sitting in there opened the trunk and he grabbed the gun out and shot [the victim]." She testified, "The trunk opens, and I said, 'Oh, God.' I turned around, and I heard a shot. When I turned back around [Defendant] was throwing the gun in there, [the victim] was falling to the ground and [Defendant] pulled off." Ms. Belcher described the gun obtained by Defendant as a longer gun "like an AK." Ms. Belcher knelt beside the victim after he was shot but recognized that he was "dead instantly." She waited at the scene until police arrived and provided officers with the victim's ID.

On cross-examination, Ms. Belcher said that the victim had a "small gun" that she first saw when she was driving them to Fayetteville. She said that the victim had the gun in his lap in the car. Regarding the fanny pack, Ms. Belcher explained that it was a "cross body bag" and that the victim wore it across his chest. When asked if the victim kept his "gun and money, and wallet" in the fanny pack, Ms. Belcher responded, "Yes." She insisted, however, that by the time they had arrived at the cookout, the victim had already gotten rid of the gun. She denied that she took the fanny pack off the victim after the shooting, and she said that she did not see anyone remove it. She said that, although the victim usually kept his ID in the fanny pack, it was in her car that day because the victim drove her car occasionally. Ms. Belcher admitted that she and the victim had taken cocaine the night before the shooting and said that they had been drinking alcohol the day of the shooting.

Regina Shelton testified that she and Defendant were dating in August 2020 and that she was with him on the day of the shooting. Ms. Shelton stated that, earlier in the day, she and Defendant took their children to a park and then took them to Defendant's mother's home. That afternoon, she, Defendant, and Defendant's three-year-old daughter went to pick up a pizza in Defendant's silver Dodge Charger. While they were waiting for the pizza, they drove to Bellview Avenue South where a cookout was being held. Defendant parked the car and got out while she and Defendant's daughter remained in the car; they were sitting together in the front passenger seat.

Ms. Shelton testified, "[T]he window was cracked and [the victim] walked up to the side of the window and looked inside. And I didn't say anything, I just sat there." Ms. Shelton explained that the victim was not threatening her or Defendant's daughter; he did not say anything to them and did not attempt to get inside the car. The victim then walked away from the car and joined a group of people at the cookout. Ms. Shelton saw the victim wearing a fanny pack, but she did not see him with a weapon.

Ms. Shelton testified that Defendant returned to the car moments later. As they began to drive away, she mentioned to Defendant that a man had looked inside the car. Defendant made Ms. Shelton describe the man, and then he said he was going to go back

- 6 -

and tell the victim, "[D]on't be looking in my car." Defendant returned to the cookout, stepped out of the car, and "pulled [the victim] to the side and told him don't look in his car." The victim tried "to walk off," but Defendant approached the victim and began yelling at him.

Ms. Shelton testified that the two men were standing in front of Defendant's vehicle and that, when they "finished arguing[,]" they separated. The victim walked to the passenger side of the car, and Defendant walked toward the back. Defendant then opened the trunk and pulled out a "big black gun." Defendant stepped around to the passenger side of the vehicle, and he and the victim argued again. While Defendant and the victim were arguing, people tried to intervene. Ms. Shelton testified, "Some of them were tugging and pulling on" Defendant and the victim. She said, "[I]t is just a lot of people yelling and screaming and the gun goes off and [Defendant] gets in the car and we drive off." She stated that she never saw the victim open his fanny pack and that she never saw him with a gun.

Ms. Shelton testified that, after shooting the victim, Defendant drove to a nearby church, stopped the vehicle, got out, and "took off running." Defendant's daughter was crying and scared, so Ms. Shelton took her to Defendant's mother's home. Ms. Shelton later met Defendant and traveled with him to Kentucky, Georgia, and Alabama. She testified:

> We ended up going to a hotel room [in Smyrna], he had somebody else with him, she got the hotel room for us. And we laid in the hotel and ended up falling asleep and when I left that is when the police surrounded my car, and I wound up going to jail[.]

Ms. Shelton agreed that she had a pending charge of accessory after the fact based upon this incident. She said that she had not received anything in exchange for her testimony and that she was testifying because she "felt like it was something [she] needed to do."

On cross-examination, Ms. Shelton said that, after initially pulling away from where they had been parked, Defendant backed up the car. The victim was standing on the sidewalk speaking to someone when Defendant got out and approached the victim. She agreed that, during the argument, she saw the victim "grabbing at his fanny pack[,]" which was across his chest, "[a]s if he was trying to unzip it like to grab something out." Ms. Shelton said she was concerned by this because she did not know what was inside the fanny pack. She agreed that Defendant's uncle was pulling on Defendant's gun and that other people were "pulling on [Defendant's] shirt and arms" prior to the gun discharging.

- 7 -

FPD Detective Dion Shockley testified that he had responded to the scene of the shooting, arriving after the victim had been transported to the hospital. He and other officers documented the scene and collected evidence, including a .233 Remington cartridge casing located on the roadway of Bellview Avenue South. Defendant was developed as a suspect soon after the shooting, but Detective Shockley learned that he had fled the scene in his silver Dodge Charger.

Detective Shockley testified that Defendant's car was found at a residence on Johnson School Road three days later and that Defendant was arrested in Smyrna on September 20, 2020. Detective Shockley interviewed Defendant after his capture, and a video recording of Defendant's interview was admitted as an exhibit to Detective Shockley's testimony. During the interview, Defendant claimed that the victim had a gun in his fanny pack, but Defendant never said that he saw the gun. Defendant said that the victim had previously threatened to kill him and described the victim as "an aggressive man." He said that he had been "very scared" and that his three-year-old daughter had been in the car with him. Defendant claimed that he had not pulled the trigger. He told Detective Shockley, "I'm not even the trigger man[,]" and he claimed that someone else confessed to the crime to Defendant's mother and Ms. Shelton.

Special Agent Lindsey Anderson, a forensic scientist working at the TBI crime laboratory in Nashville, described the nature of her work, explaining that she analyzes trace evidence, such as gunshot residue, and prepares reports with her findings. The trial court admitted Agent Anderson as an expert in the field of microanalysis without objection from Defendant. Agent Anderson said that the TBI received Defendant's silver Dodge Charger for testing. She explained, "I myself did not perform the analysis, but I did the technical review which means that I went through all data packets and agreed with the conclusions that the primary analyst reached before the report was issued[.]" She stated that Special Agent Kyle Osborne had been the primary analyst but that he had since left his employment with the TBI and moved to another state. Agent Anderson continued:

> So . . . generally the primary analyst will perform the analysis independently. So he will collect the samples, if necessary, prep them for analysis, run the actual instrumentation and go through all of the data and make his conclusions. Once that is done he will write his report and I will be handed the folder with his data packets and I can review all of his data and assure that I reach the same conclusion before we let the report go out. So for all intents and purposes the technical reviewer does everything but push the buttons on the instrument.

Agent Anderson testified that Defendant's car was tested for gunshot residue, which consisted of three elements: antimony, barium, and lead. She stated:

This vehicle was sampled for gunshot primer residue based on the statement of facts that [Agent Osborne] received on the submittal. Based on the information he was given he chose to sample the interior of the vehicle, including the seats, the steering wheel, dashboard and things like that, as well as the headliner. And he did also stub . . . the driver's rear exterior of the car.

At this point, defense counsel requested a sidebar. During the sidebar, defense counsel objected, stating, "Judge, I don't know that I necessarily have a problem with [Agent Anderson] testifying from a report she looked over. I don't know if she can tell us what [Agent Osborne] did or did not do, that is not in the report." After some discussion between the parties, the trial court said, "I don't really see there is a problem." The court noted that Agent Osborne "had a duty to report these things and this was done in the normal course of [the] TBI's investigation and kept in the normal course of business."

Following the sidebar, the State asked Agent Anderson, "[D]oes the TBI keep records of each activity, each test, documentation of what . . . every agent does on any particular piece of evidence?" She responded that an analyst's "bench notes record what the analyst did with the evidence on any particular day." She said that she reviewed Agent Osborne's notes and data and confirmed the results reached by Agent Osborne.

Agent Anderson went on to explain that all gunshot residue is collected with "little sticky stubs" that the analyst dabs across a surface and then stores in a plastic vial or box. She said that, after the analyst swabbed Defendant's car, he would have sealed the swabs with evidence tape and signed the seal. Once he received it back into the lab for analysis, the analyst likely opened the bag and marked it, including the case number, exhibit number, date and initials. As Agent Anderson explained, this is how "all" analysts at the TBI handle evidence. At this point, the State admitted as an exhibit the swabs taken from Defendant's Dodge Charger by Agent Osborne, without objection from Defendant. The State also admitted, without objection, the Official Microanalysis Report that was prepared by Agent Osborne on December 23, 2020.

Agent Anderson continued her testimony by explaining that Agent Osborne identified particles consistent with gunshot residue primer on the stubs he collected from Defendant's car, meaning that the residue "only contained two of the three elements [analysts] look for." She testified that the particles found on the stubs "are known to come from gunshot primer residue but, they can come from other sources[,]" such as brake pads, fireworks, and airbags. Agent Anderson concluded, "So, this report basically states he found particles consistent with gunshot primer residue. It could have come from the discharge of a firearm or it could have come from one of the other sources."

On cross-examination, Agent Anderson reaffirmed that the examination of the car and the analysis of the collected evidence was conducted by Agent Osborne. She stated that he collected stubs from Defendant's car and then analyzed the stubs using an automated method on an instrument in the lab and that she could "tell from [Agent Osborne's] data packet that that automation was performed correctly." Agent Anderson explained that the "automated process is the same for all of [the TBI's] specialized microscopes so that method is standard across the board." She said that, once the automated process is complete, "the instrument will provide the data packet of what it found . . . . And that list of particles it finds is what we use to go back and confirm particles."

At one point, Agent Anderson was asked if she knew "what portions of [Defendant's] car were tested[,]" and she responded, "Yes, based on [Agent Osborne's] notes I can tell you what was tested. Would you like me to read those." Defense counsel replied, "Yes." Reading from the bench notes, Agent Anderson stated that Agent Osborne collected seven stubs from the car in the following areas: the driver's seat, steering wheel, gear shift, driver's side door panel, front passenger seat, dashboard, headliner, the entire back bench seat, and the driver's side rear exterior. She reiterated that none of the stubs collected particles that contained all three elements found in gunshot residue.

TBI Special Agent Militza Kennedy testified that she was a forensic scientist working in the Forensic Biology Unit of the TBI crime laboratory in Nashville when Defendant's car was submitted to the lab for testing. Agent Kennedy described how she tested Defendant's car for the presence of blood. She said that, when she processed Defendant's car, the driver's side exterior door gave a positive result for biological material. Agent Kennedy took a swab of the "staining" that she saw and placed it in a swab box. She stated that her testing indicated that the swab contained blood but that she was unable to determine if it was human blood because she did not have enough material to do further DNA testing.

Special Agent Savannah Houk testified that she worked in the Firearm and Toolmark Examination Unit of the TBI crime lab. She received a fired .223 Remington caliber cartridge case that was recovered from the crime scene. Agent Houk said that this type of ammunition was "normally fired from an AR-15 style rifle or pistol." Agent Houk explained that because she did not receive a weapon, she was unable to perform a test fire to determine anything further about the cartridge case.

The parties then entered a stipulation that Defendant:

was convicted of a felony offense in Lincoln County Circuit Court on May 8, 2005 of aggravated burglary which has an offense date of October 2nd of

- 10 -

2004. And by statute for purposes of Count Two, felon in possession of a firearm, it is listed as a felony crime of violence.

Following the State's case-in-chief, Defendant called Jeffrey Wright, who testified that he attended the cookout on August 2, 2020. Mr. Wright said that he and the victim "smoked some weed together" and that the victim was drinking alcohol too. Mr. Wright was standing across the street from Defendant's car when the victim and Defendant began arguing. Mr. Wright could not hear what they were saying, but "[f]rom their body language," he "knew it was heated[.]" The victim was wearing a fanny pack, and Mr. Wright saw the victim reaching for it as several people tried to separate Defendant and the victim. Defendant's uncle got between Defendant and the victim, trying to "pull back" Defendant and telling Defendant, "No, nephew! No, nephew!"

Defense counsel then asked Mr. Wright if he had previously seen a gun in the victim's fanny pack, to which the State objected. During a sidebar, the trial court stated:

> I don't know how familiar the witness is with the victim in this case and if he knew the victim had a habit of carrying it there. Even if he did [Defendant] would have to know that to put him in reasonable fear for the state of mind exception to come in.
>
> . . . .
>
> [T]his is not the character type issue like under 405. This is a state of mind issue. If [D]efendant knew that the victim had a habit of carrying a gun in there then that could go to his state of mind at the time of the shooting. Agree or disagree?

The following exchange then occurred:

> [THE STATE]: But it would have to be [D]efendant's state of mind.
>
> THE COURT: It is [D]efendant's state of mind, not the witness.
>
> [THE STATE]: But this witness testifying that whether that habit existed or not would have no evidence on [D]efendant's state of mind. It would have to be [D]efendant's knowledge of that habit.
>
> THE COURT: I'm not disagreeing with you. So without me sending everybody back out what is it you expect [Mr. Wright] to say in regard to this question.

- 11 -

[DEFENSE COUNSEL]: That he is familiar with [the victim] and that they have done drugs on different occasions and that he knows that he had a gun -- had a gun in his fanny pack on previous occasions, that is where [the victim] kept his gun.

THE COURT: Was this communicated to [D]efendant[?]

[DEFENSE COUNSEL]: Is this communicated to [D]efendant?

THE COURT: Yes.

[DEFENSE COUNSEL]: On that day?

THE COURT: It does not necessarily have to be that day, it has to be before the fact of [D]efendant's state of mind, he would have some reasonable fear of deadly force in this. He would have to know that the victim had a habit of carrying the weapon in the fanny pack. It is not necessary that he carried it on that particular date. Did he have a habit of doing so, so that he had a reasonable belief what he was doing was defending himself.

[DEFENSE COUNSEL]: Yes. That is [D]efendant's state of mind. He did know that is where the gun came from.

[THE STATE]: I don't see how unless [D]efendant is aware of that . . . [Mr. Wright's] knowledge of that can in no way affect [D]efendant's state of mind.

. . . .

THE COURT: I think -- [defense counsel], I think the cart is before the horse.

[DEFENSE COUNSEL]: Can we . . . take Mr. Wright off the stand and let me speak to [Defendant] about testifying, that might get us to where we are going to be.

. . . .

THE COURT: So I think that evidence is premature at this particular point. Do you understand my ruling? I'm not saying it is not material, I'm

- 12 -

saying it is premature because we have not established what [D]efendant knew or had reason to know or believed at the time the incident occurred.

[DEFENSE COUNSEL]: I understand your ruling, but if that is the ruling I guess I would ask to be able to go speak to [Defendant] if he is willing to testify, and if he wants to testify I'll put him on and then all of the other witnesses after and they can follow-up whatever we need to and go from there.

After a recess, Mr. Wright returned to the stand, where defense counsel continued his questioning. At one point, defense counsel asked, "Do you know what [the victim] usually kept in his fanny pack[?]" Again, the State objected, and defense counsel responded, "I think if [Mr. Wright] has personal knowledge of what is in the fanny pack it is relevant. If he seen it with his own eyes he would have knowledge of it and should be allowed to testify . . . what is in there." The trial court maintained its earlier ruling, stating:

We talked about state of mind . . . I mean there has been some inference made that [D]efendant had some knowledge of that but there is nothing, all [of] it is inference so there is not any of what I would consider evidence . . . .

On cross-examination, Mr. Wright testified that, prior to the shooting, Defendant's uncle was standing in front of Defendant with his arms stretched out wide. Mr. Wright demonstrated how Defendant's uncle was moving his arms up and down like he was trying to block a basketball shot. Mr. Wright agreed that the gun "went off" when it was in Defendant's hand and pointed at the victim and that Defendant pulled the trigger.

Mr. Wright testified that he had known the victim for over twenty years. He said that he had seen the victim in town in the weeks before August 2, 2020, and that the victim had a fanny pack with him at the time. Mr. Wright stated that the victim also wore a fanny pack at the cookout and that the victim was "going for his gun in his [fanny] pack" prior to being shot by Defendant. He agreed, however, that he did not actually see the victim with a gun on that day.

Defendant testified that he had known the victim for a long time prior to the shooting, and he recalled several interactions he had had with the victim in 2020. Defendant said that, in the spring of 2020, he saw the victim at a mutual friend's house and that the victim had drugs, money, and a black gun in a dark-colored fanny pack that the victim wore. Then, in June 2020, Defendant was at a friend's apartment complex when he saw the victim "with his bag open, rolling up some weed[.]" Defendant "could see money,

- 13 -

weed, dope and the gun" inside the bag. He testified that the gun appeared to be a small 9mm.

Regarding the day of the offense, Defendant testified that he, Ms. Shelton, and his young daughter went to pick up a pizza in his silver Dodge Charger. After being told the pizza was not ready, Defendant decided to drive to Bellview Avenue South to deliver cigarettes to a friend who lived in a nearby apartment complex. Defendant stated that he parked on the street by a fence and that, when he opened his car door, the victim came up to him and asked if he had any "weed." Defendant told the victim that he did not have anything and then walked over to his friend's apartment. About five minutes later, he exited the apartment and returned to his car.

Defendant testified that, as he pulled away, Ms. Shelton told him that a guy in a Tennessee Titans jersey had been looking into Defendant's car. Realizing that she was talking about the victim, Defendant backed up "to see what [the victim] had going on." Defendant asked the victim if the victim was looking for him, and the victim responded, "[N]o, I thought it was my car." Defendant said that, when he told the victim that the victim had "just seen [him] pull up there," the victim began cursing at him. Defendant said that the victim's breath smelled of alcohol and that the victim's eyes were "glossy." Defendant testified that the victim was "very aggressive[,]" so he told the victim to stay away from his car. Defendant said that the victim began "cussing" and grabbing at the fanny pack the victim was wearing. Defendant stated that, while the victim was clutching the fanny pack, he saw an outline of a gun inside it.

Defendant testified that he got back into his car and attempted to drive away but that the victim stood in front of the car and would not move. Defendant stated that, when he opened his car door and asked the victim to "please move[,]" the victim said, "No b**ch, I'm trying to see you. What's up?" He said that the victim still had his hand on what appeared to be a gun inside the fanny pack, and the victim told him, "I am going to fire your a** up, fire this car up[.]" Defendant testified that he told the victim that his daughter was inside the car but that the victim responded, "F**k that b**ch." At this, Defendant popped the lid of his car trunk and retrieved his gun, an AR-15. Defendant testified that the gun had belonged to Ms. Shelton's ex-boyfriend, that he had never shot it before, and that he had not known if it was loaded.

Defendant said that the victim was on the passenger side of his car and was following him "the whole time, still talking crazy." Defendant stated that he had the gun pointed at the ground and that he told the victim to "[s]top playing" and "move out of the way[.]" Defendant said that his uncle and other people grabbed at his gun and pulled on him, and then the gun discharged.

- 14 -

Defendant stated that the victim had his hand on his fanny pack and was "messing with the zipper." Defendant said that he thought the victim was trying to open the fanny pack and retrieve a gun. Defendant said that he became "[v]ery fearful" because the victim was drunk and "geeking" and was preventing him from leaving the scene. Defendant said that he thought the victim might shoot into his car and kill his daughter. He testified, however, that he had not intentionally pulled the trigger and that he had not wanted to shoot the victim. Defendant said that, after shooting the victim, he panicked and fled the scene; he said that he was still concerned for his daughter's safety and wanted to get her out of there.

On cross-examination, Defendant stated that, every time he saw the victim in the months leading up to August 2020, the victim had a fanny pack with him that contained a gun. Defendant testified that the victim had told him that he had thought about killing him because they had once gotten into a fight when they were younger. Defendant stated that he did not shoot the victim in self-defense; he claimed that "the gun accidentally went off" and that he did not intentionally fire the weapon.

Defendant admitted that he "got rid of" the gun after shooting the victim, but he insisted that he did not remember "what [he] did with it." He said that Ms. Shelton later picked him up near a Family Dollar store and that she drove him out of town. He admitted that, in the weeks following the shooting, he went to Alabama, Georgia, and Kentucky before he was eventually located in Smyrna. Defendant acknowledged that he was guilty of Count Two—felon in possession of a weapon.

Eddie Ray Massey, Defendant's uncle, testified that he attended the cookout on Bellview Avenue South on August 2, 2020. He estimated that there were around 100 people at the cookout. At one point, Mr. Massey saw Defendant and the victim arguing. Mr. Massey stepped in between Defendant and the victim and attempted to talk to them and "cool the situation down." Mr. Massey then turned around and began walking across the street because he believed "everything was cool." When he looked back, he saw Defendant's trunk lid open, and Defendant removing a gun from the trunk. Mr. Massey approached Defendant and tried to "push" the gun. He testified that he raised his arm above his head and then "swiped down" at the gun and that the gun "went off."

On cross-examination, Mr. Massey agreed that Defendant was holding the gun "straight out." He denied grabbing the gun; he said that he swiped down at it with his arm and that "the rifle hit up under [his] arm." Mr. Massey denied pulling the trigger and said that he did not know why the gun fired.

On rebuttal, the State recalled Detective Shockley, who testified that he interviewed Mr. Massey approximately two weeks after the shooting. Mr. Massey said that he reached

up and grabbed Defendant's gun in attempt to stop Defendant from shooting the victim; he did not tell Detective Shockley that the gun discharged accidentally.

Following deliberations, the jury found Defendant guilty of the lesser-included offense of reckless aggravated assault resulting in death in Count One and of felon in possession of a weapon in Count Two.

### *Sentencing*

At a subsequent sentencing hearing, the State entered Defendant's presentence report into evidence without objection. Jonathan Williams testified that he was the presentence report writer for the Department of Correction Division of Probation and Parole. Mr. Williams testified that his review of Defendant's criminal record showed that Defendant had five prior felony convictions, ten prior misdemeanor convictions, and multiple violations of probation, and certified copies of Defendant's prior judgments of conviction were entered as an exhibit to Mr. Williams's testimony. He said that Defendant also had pending charges of assault and vandalism under $1,000 based upon an incident in the jail. Mr. Williams said that Defendant reported he had obtained his GED and that Defendant provided "a handful of prior places of employment." Mr. Williams was only able to verify one place of employment at Connor Industries from 2019 to 2022.

When asked about Defendant's "STG" affiliation, Mr. Williams explained that the term meant that Defendant was a part of a security threat group—essentially a "gang." Mr. Williams stated that, according to the Tennessee Offender Management System (TOMIS), Defendant was a confirmed member of the Gangster Disciples. Defense counsel objected, pointing out that the presentence report indicated that this affiliation was only "suspected[.]" The trial court noted that it would "take the presentence report for what it states." Mr. Williams later acknowledged that he "accidentally misspoke" and clarified that Defendant was a suspected member of the Gangster Disciples.

Mr. Williams testified that a STRONG-R Needs Report was completed; he said that the assessment showed that Defendant was a "high risk" for violence. He explained that the "[six] months prior to [the] interview tends to factor very heavily on . . . the results of the assessment." Mr. Williams stated that, when he interviewed Defendant, Defendant informed him that he had gotten "in trouble at the jail within the past [six] months" and that he had a pending aggravated assault charge. Mr. Williams confirmed that information with the jail and further learned that Defendant had "numerous write-ups" while there—all of which factored into the results of the STRONG-R Needs Report.

Detective Shockley testified that he had worked in law enforcement in Fayetteville for twenty-four years and had worked on several different murder investigations. He said

that there was a need to deter the type of crime committed by Defendant in the area. He explained that there had been many homicides in the area of Bellview Avenue South in particular, such that officers referred to the street as "Death Row."

Investigator Patrick Murdock of the Lincoln County Sheriff's Department testified that he was involved in an investigation into an assault that occurred in the Lincoln County Jail on October 17, 2024. Investigator Murdock testified that there was a video of the incident, and the video was admitted as an exhibit to his testimony. Investigator Murdock explained that the video showed Defendant's starting a fight with another inmate, Brad Martin, who was lying "in his bunk asleep or trying to sleep[.]" He stated that Defendant picked up Mr. Martin, "slam[med] him, [got] on top of him and start[ed] w[ai]ling on him for a good bit of time." He said that the fight had stopped but that Defendant then returned to Mr. Martin three times to continue the attack. Investigator Murdock testified that Mr. Martin suffered serious injuries from the assault. He said that Mr. Martin suffered a cut under his left eye, which required sutures. Mr. Martin had a cut to the side of his head that was also sutured, and he had "a mark across his neck and a hip injury."

Following argument of counsel, the trial court found beyond a reasonable doubt that Defendant was a Range II multiple offender. The court noted that it considered: the presentence report; the purposes and principles of sentencing; certain enhancement and mitigating factors; Defendant's physical and mental condition and his social history; the facts and circumstances surrounding the offenses; the nature of the criminal conduct involved; Defendant's prior criminal history; and his potential for rehabilitation. The court found that enhancement factors one, eight, and thirteen applied to both convictions and that, additionally, enhancement factor nine applied to Count One. The court stated that it placed "a great deal of emphasis" on enhancement factor one. Regarding mitigating factors argued by Defendant, the trial court found factor eleven could be applied, but the court gave the factor "minimum weight." Ultimately, the trial court sentenced Defendant to eight years for reckless aggravated assault resulting in death in Count One and to twenty years for felon in possession of a weapon in Count Two. The court ordered the sentences to run consecutively for a total effective sentence of twenty-eight years' incarceration.

In ordering consecutive sentencing, the trial court found that consecutive sentences were appropriate given Defendant's "extensive" criminal history, noting that Defendant had sixteen prior convictions. The court concluded:

[Defendant's] date of birth according to the Presentence Report is 1985. These events occurred in 2020. And so he would have been . . . [thirty-five] years old at the time. So he managed to get at least a conviction every other year since reaching the age of majority. And five of the approximately

- 17 -

[sixteen] convictions are felonies, serious felonies at that. Particularly the aggravated burglary and felon in possession of a weapon.

Defendant filed a timely motion for new trial, which the trial court denied in a written order following a hearing. This timely appeal follows.

## Analysis

### *Sufficiency of the Evidence*

Defendant asserts that the evidence is insufficient to support his conviction for reckless aggravated assault resulting in death in Count One, arguing that that the State failed to prove "the culpable mental state of recklessness" and that the proof established that he acted in self-defense. Regarding Count Two, Defendant insists that the State failed to establish he had the "intent to go armed[,]" arguing that he "did not get out of the car armed, nor did he have direct access to the weapon while he was at the location of the altercation. In fact, he had to get to the back of his vehicle and open the truck to get the weapon."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, a person commits aggravated assault "who . . . [r]ecklessly commits an assault as defined in § 39-13-101(a)(1)," and the assault results in death to another person. Tenn. Code Ann. § 39-13-102(a)(1)(B)(ii) (2020). "'Reckless' means that

a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(a)(33) (2020).

Viewing the evidence in the light most favorable to the State, the proof established that, during a heated argument with the victim, Defendant pulled a loaded AR-15 out of the trunk of his car, pointed it at the victim, and pulled the trigger, shooting the victim in the chest. Defendant's actions caused the victim's death; Dr. Carney testified that the victim's cause of death was a gunshot wound to the chest, explaining that the bullet tore the victim's aorta in half. Although Defendant insists that he acted in self-defense, he testified at trial that he did not shoot the victim in self-defense but that "the gun accidentally went off." In any event, it is well settled that this is a factual determination to be made by the jury as the sole trier of fact, *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993), and it was within a jury's prerogative to reject Defendant's claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Moreover, there was evidence from which the jury could conclude that Defendant acted recklessly. Any rational juror could have found the essential elements of reckless aggravated assault resulting in death beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

Additionally, when viewed in the light most favorable to the State, the evidence established that Defendant, as a convicted felon, illegally possessed a firearm. As relevant in this case, "[a] person commits an offense who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence[.]" Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2020).[1] The State proved that Defendant had been previously convicted of a felony crime of violence as Defendant stipulated to this fact. Furthermore, multiple witnesses, including Defendant, testified that Defendant possessed a firearm, which he removed from the trunk of his car and used against the victim. Defendant is not entitled to relief based upon his challenge to the sufficiency of the evidence.

### *Admission of Agent Anderson's Testimony*

Defendant contends that the trial court abused its discretion by allowing Agent Anderson to testify about the areas of Defendant's car that Agent Osborne collected samples from and his subsequent testing of those samples for gunshot residue. Defendant asserts that the trial court allowed Agent Anderson "to explain things that only [Agent Osborne] could have testified to" and "to the subjective knowledge" of Agent Osborne.

---

[1] We note that Defendant's challenge to the sufficiency of the evidence in Count Two refers to Tennessee Code Annotated section 39-17-1307(a), which requires proof of the intent to go armed; however, Defendant was indicted and convicted pursuant to code section 39-17-1307(b)(1)(A), which does not require proof of the intent to go armed.

- 19 -

He contends that Agent Anderson's testimony was a violation of the rule against hearsay and a violation of the Confrontation Clause of the United States Constitution. Defendant maintains that Agent Anderson "should have only been allowed to testify as to tests that she herself . . . performed and generally how tests are performed per routine procedure and to the report and the contents thereof."

The State responds that Defendant waived our consideration of this claim. The State correctly notes that, when Defendant raised an objection during Agent Anderson's testimony, he failed to assert the legal basis for his objection; he did not raise a hearsay objection, nor did he articulate that her testimony violated his right to confrontation. It is well established that the failure to object on a specific basis results in waiver of the issue on appeal. *See, e.g., State v. Weeden*, 733 S.W.2d 124, 126 (Tenn. Crim. App. 1987). Moreover, Defendant failed to specify any legal grounds for the claim in his motion for new trial. *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"). Thus, we agree with the State that Defendant waived this issue.

Nevertheless, "[w]hen necessary to do substantial justice," an appellate court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

While the record clearly established what occurred in the trial court, Defendant has not argued, and we cannot conclude, that the other *Adkisson* factors are met. At trial, Defendant did not object to the admission of the Official Microanalysis Report prepared by Agent Osborne, and he raises no concerns about the trustworthiness or general acceptance of Agent Osborne's data. Moreover, on cross-examination, Defendant asked Agent Anderson to read from Agent Osborne's bench notes about the areas from which he collected samples. Defendant does not contest the results of Agent Osborne's testing,

which were confirmed by Agent Anderson during her technical review, and Defendant provides no explanation as to how cross-examining Agent Osborne would have aided in his defense.

Furthermore, the results of the gunshot residue testing were not particularly compelling. Agent Anderson explained that the testing only revealed "two of the three elements [analysts] look for" in confirming the presence of gunshot residue. She testified that the two elements found on the stubs were "known to come from gunshot primer residue but [that] they can come from other sources[,]" such as brake pads, fireworks, and airbags. In any event, the State presented extensive evidence from eyewitnesses, who identified Defendant as the shooter and testified he fled in his car immediately after the shooting, and Defendant acknowledged that he was holding the gun when it "went off." Thus, it is exceedingly unlikely that the admission of Agent Anderson's testimony had any impact on the jury's decision making whatsoever. *See Adkisson*, 899 S.W.2d at 642. Defendant is not entitled to plain error relief.

### *Testimony About the Victim's "Violent Tendencies" and Frequent Possession of a Gun*

Defendant alleges that the trial court erred by prohibiting him from corroborating aspects of his testimony through cross-examination of the State's witnesses. He notes that, during his testimony, he claimed that the victim was the first aggressor, that he knew the victim frequently carried a gun in a fanny pack, and that the victim had violent tendencies. Defendant asserts, that he should have been able to cross-examine State witnesses "by asking them about their knowledge to corroborate his testimony."

Defendant also contends that the trial court erred by excluding testimony regarding Mr. Wright's knowledge of the victim's "frequent possession of a weapon" and violent tendencies. Defendant asserts that Mr. Wright's testimony would have corroborated his testimony that the victim frequently carried a gun and had violent tendencies, thereby supporting his claim that he acted in self-defense.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion in ruling the evidence inadmissible." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause, by their very nature, discretionary decisions involve a choice among

- 21 -

acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id*.

Tennessee Rule of Evidence 404(a)(2) states generally:

Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

. . . .

> In a criminal case, . . . evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor[.]

Tenn. R. Evid. 404(a)(2). When such evidence is admissible, the method of proving a character trait under Rule 404(a) is governed by Tennessee Rule of Evidence 405. *State v. Wilkey*, No. E2021-00549-CCA-R3-CD, 2022 WL 2387762, at \*17 (Tenn. Crim. App. July 1, 2022) (citing *State v. Joslin*, No. 03C01-9510-CR-00299, 1997 WL 583071, at \*36 (Tenn. Crim. App. Sept. 22, 1997)). Rule 405(a) states:

> Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

> > (1) The court upon request must hold a hearing outside the jury's presence,

(2) The court must determine that a reasonable factual basis exists for the inquiry, and

(3) The court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Tenn. R. Evid. 405(a).

"When a defendant relies on a theory of self-defense and that the alleged victim of a violence crime was the first aggressor, the defense may present evidence of the victim's prior history of violent conduct." *State v. Smith*, No. W2018-01509-CCA-R3-CD, 2020 WL 3572071, at \*11 (Tenn. Crim. App. June 30, 2020), *perm. app. denied* (Tenn. Dec. 3, 2020) (citing *State v. Ruane*, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), *abrogated on other grounds by State v. Rogers*, 992 S.W.2d 393, 401 (Tenn. 1999)). Prior violent acts by the victim may be admissible as substantive evidence of the defendant's state of mind if the defendant was aware of them, or if the defendant was unaware of them, they may be admissible for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor. *Joslin*, 1997 WL 583071, at \*36. Evidence which is admitted solely to corroborate other evidence that the victim was the first aggressor does not fall under Rule 404(a)(2) or Rule 405. *State v. Jones*, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at \*7 (Tenn. Crim. App. Apr. 5, 2012).

Tennessee Rule of Evidence 406(a) provides, in relevant part, that "[e]vidence of the habit of a person, . . . whether corroborated or not and regardless of the presence of eye-witnesses, is relevant to prove that the conduct of the person . . . was in conformity with the habit[.]"

Initially, we note that Defendant does not identify in his brief which of the State's witnesses the trial court prevented him from cross-examining about this topic and the basis for the trial court's ruling. Our review of the record indicates that the only State witness Defendant sought to cross-examine about the victim's aggressiveness was Ms. Shelton, to which the State objected. During a sidebar, the trial court ruled that Defendant could ask Ms. Shelton about the victim's aggressiveness if she first testified that she knew the victim. Ms. Shelton, however, denied knowing the victim. When questioned by defense counsel, she testified that she had never seen the victim at her workplace, that she had never dated him, and that the day of the shooting had been the first time she had ever seen him. Thus, the trial court did not abuse its discretion by finding that Defendant had no basis to question her about the victim's aggressiveness or violent tendencies. *See McCaleb*, 582 S.W.3d at 186.

- 23 -

Regarding Defendant's assertion that the trial court erred by excluding testimony as to Mr. Wright's knowledge of the victim's violent tendencies, there was no abuse of discretion by the court because the record reflects that Defendant never questioned Mr. Wright about the victim's violent tendencies, his reputation for violence, or about specific instances of violent behavior by the victim.

As for Defendant's claim that the trial court abused its discretion by excluding Mr. Wright's testimony about the victim's habit of carrying a gun, we note that the trial court did not rule the evidence was inadmissible; rather, the court determined that defense counsel needed to first establish that Defendant believed the victim had a gun inside his fanny pack at the time of the shooting. Following Defendant's testimony establishing this fact, however, defense counsel never recalled Mr. Wright to testify. Had defense counsel done so, based upon its earlier ruling, the trial court would have allowed Mr. Wright to testify about the victim's habit of carrying a gun to corroborate Defendant's testimony and prove the victim's conduct in conformity with the habit on the day of the shooting. We conclude that, by failing to recall Mr. Wright, Defendant waived the issue. *See* Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Moreover, Defendant has not shown the need for plain error review. *See Adkisson*, 899 S.W.2d at 641-42. He is not entitled to relief.

### *Sentencing*

Defendant contends that the trial court abused its discretion by imposing an excessive sentence. Specifically, he argues that the court erred by relying upon the STRONG-R Needs Report and the presentence report because they were "filled with several inaccuracies including the statement that [Defendant] was suspected of being affiliated with an organized crime unit over twelve years ago, and that he intentionally assaulted a fellow inmate." Defendant also asserts that the trial court erred in its application of enhancement and mitigating factors and by imposing consecutive sentences. He argues that the trial court put too much weight on his prior criminal history and that the court should have taken into consideration that he acted in self-defense.

### 1. Presentence Report/STRONG-R Needs Report

Tennessee Code Annotated section 40-35-210(b) requires that a trial court consider the following when determining a specific sentence to impose upon a defendant:

(1) The evidence, if any, received at the trial and the sentencing hearing;

- 24 -

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b) (2023).

In this case, the sentencing hearing transcript reflects that the trial court considered the factors in Tennessee Code Annotated section 40-35-210(b) before imposing Defendant's sentence. The presentence report was admitted as an exhibit at the sentencing hearing, and Mr. Williams testified concerning the report. At one point, Mr. Williams said that, according to TOMIS, Defendant was a confirmed member of the Gangster Disciples. Defense counsel objected and pointed out that the presentence report indicated that this affiliation was only "suspected," and the trial court ruled that it would "take the presentence report for what it states[.]" Mr. Williams then acknowledged that he misspoke, and he clarified that Defendant was only a suspected member of the Gangster Disciples. Defendant has not established that this information is inaccurate; at the sentencing hearing, Defendant offered nothing to contradict Mr. Williams's testimony that he was a suspected gang member. Thus, the trial court did not abuse its discretion by relying on the presentence report in sentencing Defendant.

Likewise, Defendant's claim that the trial court improperly relied upon the STRONG-R Needs Report because of references to his assault on a fellow inmate at the Lincoln County Jail is unavailing. The State presented testimony from Investigator Murdock regarding the assault, and it introduced a video of the assault. Although Mr. Williams testified that the STRONG-R Needs Report showed Defendant was a "high risk" for violence, he explained that the "[six] months prior to [the] interview tends to factor

very heavily on . . . the results of the assessment." Mr. Williams stated that, when he interviewed Defendant, Defendant informed him that he had gotten "in trouble at the jail within the past [six] months" and that he had a pending aggravated assault charge. Mr. Williams confirmed that information with the jail and further learned that Defendant had "numerous write-ups" while there, and he explained that this information factored into the results of the STRONG-R Needs Report. Defendant has not shown that the information about the assault testified to by Investigator Murdock and used by Mr. Williams in the report was inaccurate in any way. Moreover, at the motion for new trial hearing, the trial court stated that, although it considered the STRONG-R Needs Report in sentencing Defendant, it did not "lean heavily" on the report and that the report had "zero" effect on the court's ruling. Defendant is not entitled to relief.

2. Sentence Length

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications;

and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial

court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles" set out in Tennessee Code Annotated sections 40-35-102 and 103. *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

The trial court found beyond a reasonable doubt that Defendant was a Range II multiple offender, and Defendant does not challenge this finding. As for Count One, reckless aggravated assault resulting in death is a Class D felony. Tenn. Code Ann. § 39-13-102(d)(1)(A)(v). A Range II sentence for a Class D felony is between four and eight years, and the trial court imposed a within-range sentence of eight years. Tenn. Code Ann. § 40-35-112(b)(4). In Count Two, possession of a firearm by a felon previously convicted of a felony crime of violence is a Class B felony. Tenn. Code Ann. § 39-17-1307(b)(1)(A). A Range II sentence for a Class B felony is between twelve and twenty years, and the trial court imposed a within-range sentence of twenty years. Tenn. Code Ann. § 40-35-112(b)(2).

In setting the sentence lengths in Counts One and Two, the trial court applied enhancement factor one—that Defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; enhancement factor eight—that Defendant, "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and enhancement factor thirteen—that, at the time the felony was committed, Defendant was on federal supervised release. *See* Tenn. Code Ann. § 40-35-114(1), (8), (13). The court also applied enhancement factor nine—that Defendant possessed or employed a firearm during the commission of the offense—as to Count One. *See* Tenn. Code Ann. § 40-35-114(9). The court weighed the enhancement factors and stated that it placed "a great deal of emphasis" on enhancement factor one. Regarding the mitigating factors argued by Defendant, the trial court found that mitigating factor eleven—that Defendant, "although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"—could be applied. *See* Tenn. Code Ann. § 40-35-113(11). However, the court gave the factor "minimum weight."

- 27 -

Here, the trial court detailed its findings and placed its reasons for the sentence imposed on the record. The record establishes that the trial court properly considered the purposes and principles of sentencing. Thus, the trial court's decision to impose a within-range sentences of eight years for reckless aggravated assault resulting in death and twenty years for felon in possession of a weapon is presumptively reasonable. *Bise*, 380 S.W.3d at 707. Given that multiple enhancement factors applied, the trial court was well within its discretion to set a mid-range sentence in Count One and the maximum in-range sentence for Count Two. Defendant is not entitled to relief on this basis.

### 3. Consecutive Sentencing

The statutory factors governing the alignment of sentences for a defendant convicted of multiple offenses are codified at Tennessee Code Annotated section 40-35-115, which provides, in pertinent part:

> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
>
> . . . .
>
> > (2) The defendant is an offender whose record of criminal activity is extensive[.]

Our supreme court recently held that a trial court should consider the following non-exclusive factors when finding that a defendant has an extensive record of criminal activity:

> (1) The amount of criminal activity, often the number of convictions, both currently before the trial court for sentencing and prior convictions or activity;
>
> (2) The time span over which the criminal activity occurred;
>
> (3) The frequency of criminal activity within that time span;
>
> (4) The geographic span over which the criminal activity occurred;
>
> (5) Multiplicity of victims of the criminal activity; and
>
> (6) Any other fact about the defendant or circumstance surrounding the criminal activity or convictions, present or prior, that informs the

determination of whether an offender's record of criminal activity was considerable or large in amount, time, space, or scope.

*State v. Perry*, 656 S.W.3d 116, 129 (Tenn. 2022) (footnotes omitted).

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id*. at 862 (citing Tenn. R. Crim. P. 32(c)(1)).

In this case, the trial court detailed its findings regarding consecutive sentencing on the record, and the decision is presumptively reasonable. *Id*. Specifically, the trial court determined that Defendant was "an offender whose record of criminal activity is extensive." *See* Tenn. Code Ann. § 40-35-115(b)(2). In reaching this conclusion, the trial court reviewed the *Perry* factors and found that Defendant had sixteen prior convictions. The court continued:

[Defendant's] date of birth according to the Presentence Report is 1985. These events occurred in 2020. And so he would have been . . . [thirty-five] years old at the time. So he managed to get at least a conviction every other year since reaching the age of majority. And five of the approximately [sixteen] convictions are felonies, serious felonies at that. Particularly the aggravated burglary and felon in possession of a weapon.

Defendant has not established that the trial court abused its discretion by imposing consecutive sentences. He is not entitled to relief.

## Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.


s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE